IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
              Plaintiff,             )
                                     )
v.                                   )        No. 3:08-CR-165
                                     )
FRED WILLIAM BUIS,                   )        (VARLAN/GUYTON)
                                     )
              Defendant.             )

## REPORT AND RECOMMENDATION

This case is before the Court on the defendant's Motion to Suppress Evidence [Doc. 10], filed on December 22, 2008. This motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). The Court held an evidentiary hearing on January 27, 2009. Assistant United States Attorney Cynthia F. Davidson represented the government. Attorneys Jeffrey Z. Daniel and Richard L. Gaines appeared on behalf of the defendant, who was also present. At the conclusion of the hearing, the defendant asked to file post-hearing briefs. The defendant filed a supplemental brief [Doc. 20] on March 13, 2009, and the government filed a responding brief [Doc. 21] on March 27, 2009. The Court took the motion, the related filings, and the evidence under advisement on March 30, 2009.

## I. POSITIONS OF THE PARTIES

The defendant stands indicted [Doc. 1] for distribution of oxycodone on September 24, 2008 (Count 1), distribution of oxycodone on September 25, 2008 (Count 2), possession of oxycodone with intent to distribute on September 26, 2008 (Count 3), possession of a firearm in

1

furtherance of a drug trafficking crime on September 26, 2008 (Count 4), and possession of a firearm not registered to him on September 26, 2008 (Count 5). The defendant asks [Doc. 10] for the suppression of all evidence stemming from the execution of a search warrant at the defendant's residence on September 26, 2008,[1] because the search violated the Fourth Amendment. He asserts that the affidavit to the search warrant fails to provide probable cause because it relies on the statements of a confidential informant who is untruthful. He maintains that the search warrant lacks particularity with regard to the place to be searched and fails to provide a nexus between the defendant's residence and criminal activity. He argues that neither the search warrant nor the affidavit provide good cause for executing the search warrant at night. Finally, he contends that the firearms seized during the execution of the warrant are not within the scope of the warrant and are not evidence or contraband. The government responds [Doc.11] that the evidence was lawfully obtained pursuant to a valid search warrant.

## II.  SUMMARY OF THE TESTIMONY

At the January 27, 2009 evidentiary hearing, the government called Detective Melvin Bayless, who testified that he had worked as a narcotics detective with the Claiborne County Sheriff's Department since 2002. Detective Bayless began investigating the defendant in February 2008. In September 2008, he was working with a confidential informant who offered to purchase

---

[1]The defendant argues [Docs. 10 and 20] that the search warrant was executed on September 25, 2008. The Court heard no evidence on the timing of the search but notes that Exhibit 4, which is the search warrant, the affidavit, and the inventory of the items taken, reveals that the search warrant was issued at 11:40 p.m. on September 25, 2008. The inventory states that the search began at 12:50 a.m. on September 26, 2008. Accordingly, the Court finds that the search at issue took place in the early morning hours of September 26, 2008.

2

oxycontin from the defendant. At Bayless's instruction, the confidential informant made controlled purchases of oxycontin from the defendant on September 24 and 25, 2008. On these occasions, Bayless met the confidential informant at a safe location and searched the informant, the informant's vehicle, and the informant's possessions to insure that the informant had no money or controlled substances. The informant was also given a recording device. Bayless conducted surveillance of the defendant's residence from an adjacent hill while the informant was making the controlled purchases. Bayless could see the defendant's driveway from this vantage point.

Detective Bayless testified that before he sought the search warrant on September 25, 2008, he listened to the tape recordings of the controlled buy, which confirmed what the informant had told him about the transaction. On the recording, Bayless heard the confidential informant meet the defendant and make a purchase. Bayless could identify the defendant's voice on the tape. Bayless had worked with this confidential informant before and had determined the informant was reliable through other controlled purchases, several of which resulted in successful prosecutions. Two other officers had also worked with this confidential informant and told Bayless that the informant was reliable.

Detective Bayless stated that before the issuance of the search warrant, he had been to the defendant's house on two prior occasions, the most recent time being within six months to one year before the search warrant issued. On one of these occasions, Bayless was called to the residence when the defendant and his wife, who were divorcing, were involved in a property dispute. When Bayless had last been to the defendant's house, it was red. Bayless acknowledged that at the time he got the search warrant, the defendant's house had beige siding. He did not know when the defendant had added the new siding. When he applied for the search warrant, Bayless composed

3

the directions to the defendant's house from memory.  He got the defendant's address from the driver's license and 9-1-1 databases.  He also obtained latitude and longitude coordinates ("GPS coordinates") from the end of the defendant's driveway using a global positioning system (GPS).  At least two other officers who were involved in the execution of the search warrant were familiar with the location of the defendant's residence.

Detective Bayless testified that the defendant lived in a country setting rather than a subdivision and that the next closest residence was one-quarter mile away.  Bayless said that one had to travel on the new construction segment of Highway 25E to get to the defendant's driveway.  He denied that he could have taken a photograph of the defendant's house before seeking the search warrant because the defendant had a gravel driveway that was approximately 200 yards long and had a locked gate at the end.  If Bayless had driven up the driveway, he would have alerted the defendant to the fact that the police were watching him.  Bayless knew that the defendant had an outbuilding that was a different color from the house, and he thought he was viewing that outbuilding when he saw a beige structure while conducting surveillance from the adjacent hill during the controlled purchases.

Detective Bayless testified that he applied for the search warrant at night because he had observed a controlled purchase that day and the team leader Lieutenant Hurley believed that going at night would preserve officer safety as the defendant had weapons in the house.  According to Bayless, the defendant had a reputation in the community for being potentially dangerous.  He said the defendant sold drugs in his living room and also kept guns there.  Bayless stated that he had information from the confidential informant that the defendant traded drugs for guns.

Detective Bayless stated that during the search of the defendant's home, officers

found 128 oxycontin pills in the living room. He stated that in his experience as a law enforcement officer, it was common for drug dealers to have guns. The officers found fifteen guns in the living room/kitchen area, including a short-barreled rifle, which they found under the table. Bayless testified that the rifle's barrel had been cut to one and one-half feet in length, which Bayless characterized as being obviously illegal. The officers found eight guns and currency in the bedroom. Bayless said that some of the currency bore the serial numbers of the bills used by the confidential informant to buy oxycontin from the defendant. The officers also found three guns in a Pontiac GTO in the garage. They also located the parts to an AK-47 in a box in the garage. The officers found a notebook, which contained lists of guns with names and amounts of money written beside them.         On cross-examination, Detective Bayless testified that although he became interested in the defendant in February 2008, his actual investigation of the defendant and work with the confidential informant related thereto was in September 2008. The confidential informant came to Bayless voluntarily, not as a result of an investigation, and wanted to participate in controlled drug purchases. The informant made two controlled purchases with the defendant on September 24 and 25. The search of the informant and the informant's car prior to the controlled purchases took five to ten minutes. Bayless agreed that the confidential informant remained clothed when searched and that a body cavity search was not performed on the informant. A drug dog was not used to search the informant's vehicle. The informant was fitted with a digital recording device during the controlled purchases, but the device did not allow Bayless to monitor the conversations as they occurred. On September 24, the informant returned with one oxycontin tablet purchased from the defendant. Once the controlled purchases were completed, Bayless debriefed the informant.

Detective Bayless testified that during both the controlled purchases, he watched

5

from a hill in front of the defendant's driveway. From this vantage point, he saw the confidential informant turn into the defendant's driveway. The purchase on September 24 occurred during the day, and the purchase on September 25 occurred at night. During his surveillance, Bayless could see the defendant's driveway but not his house. Bayless did not drive to the edge of the defendant's driveway during the controlled purchases but, instead, drove to a point on Highway 25E. The defendant's driveway connects to the newly constructed portion of Highway 25E, and although it was possible to drive on this portion of the new construction in September 2008, the road was suppose to be limited to construction traffic. Bayless identified a photograph (Exhibit 2) of the defendant's house taken from the newly constructed portion of 25E beyond the defendant's driveway. He agreed that the defendant's house could be seen from the road in this picture but explained that he did not travel on the newly constructed portion of 25E beyond the defendant's driveway in September 2008 because the defendant might have seen him. At that time, only construction workers should have been on that part of the road.

Detective Bayless stated that from the hill on which he conducted surveillance, he could see a portion of a building, which was the same color as the defendant's residence in Exhibit 2. On the day of the search warrant, Bayless viewed the defendant's residence from the hill through binoculars, but he thought he was looking at one of the outbuildings because he thought the defendant's house was red. He explained that he had not made a visual inspection of the defendant's residence for a year at the time the search warrant was executed. He agreed that the color of the defendant's house on the search warrant was wrong.

Detective Bayless reviewed the directions to the defendant's house provided in the search warrant. He agreed that the directions were inaccurate because they instruct the executing

officer to turn right off Highway 25E to the defendant's driveway. He also agreed that there was another house on the right about one-quarter of a mile from the defendant's house and sitting off old 25E. He did not agree that there was a gravel driveway on the right across from the defendant's house. Bayless presented the search warrant application to Judge Eastep. He agreed that he did not ask for special permission to search at night.

On redirect examination, Detective Bayless testified that he took the GPS coordinates that he listed in the search warrant from the end of the defendant's driveway.

The defendant called Larry Davis, a licensed private investigator who had previously worked about thirty-three years for the Knox County Sheriff's Department, retiring in January 2008. Mr. Davis stated that he was asked by defense counsel to follow the directions in the search warrant in this case to see if he could locate the residence to be searched. Davis followed the search warrant's directions to turn onto the new construction area of Highway 25E and to proceed .3 miles to a gravel driveway on the right. Davis said that upon going .3 miles on the new construction portion of Highway 25E, he saw a dirt and gravel roadway, which is depicted in Exhibit 5, that looked as if it was not used much. Davis could see a gray frame house across old 25E (pictured in Exhibit 6) from that location .3 miles down the new construction. He stated that he could not find the residence to be searched at this location.

Mr. Davis testified that he next proceeded to the longitude and latitude given on the search warrant with the aid of a GPS. He said the GPS directed him to a point on the new construction portion of 25E. At that point, Davis saw two roads on either side of 25E. One road went South and downhill. Davis identified a picture (Exhibit 7) of this road. Near this gravel road was a "gray structure," which was shown in Exhibit 10. On the other side of new 25E from the GPS

7

point, a driveway led uphill to another "gray structure," which was depicted in Exhibit 9.[2] Davis used a rolling measuring device to determine the distance from both of these gray structures to the point of the GPS coordinates. The gray structure that was near the gravel road running South from the GPS point was 899.6 feet from the GPS point. The other gray structure that was at the end of the driveway going uphill from the GPS point was 949.7 feet from the GPS point. Davis noted that neither of these structures or houses had red siding.

Mr. Davis stated that given what he encountered when he attempted to follow the directions in the search warrant, he would not have executed the warrant. Turning right after traveling .3 miles on the new 25E led to a forest. At the GPS coordinates given in the search warrant were two driveways both leading to gray houses. Both structures had vehicles outside as described in the search warrant. The residence downhill from the GPS point did not have outbuildings and the residence uphill did. The search warrant did not refer to any outbuildings when describing the residence to be searched. In his opinion based on thirty years of law enforcement experience, he would not have executed the search warrant at this point.

On cross-examination, Mr. Davis testified that he thought the road to the right of the GPS point was a driveway possibly leading to old 25E. He acknowledged that a guardrail blocked access to this driveway from new 25E but stated that there were breaks at other points in the guardrail, which would permit passage around it. He also agreed that this driveway abutted old 25E at the bottom of the hill. He stated that to the left of the GPS point in the middle of new 25E was the driveway that went uphill, as pictured in Exhibit 9, and ended at a residence. Davis testified that

---

[2] The Court notes that Exhibit 9 was also referred to as Exhibit 11 during part of the testimony.

the GPS point was about 100 yards from the point .3 miles after getting on the new construction portion of 25E. He agreed that had he been the executing officer and if he knew where the defendant lived, he would have gone to where he knew the defendant's residence to be, even though the search warrant said to turn right instead of left. On redirect examination, Davis testified that if he had known where the defendant lived, he would have included the correct directions in the search warrant.

Richard Peck testified that he had worked as a carpenter before his retirement. He installed clay or cream-colored vinyl siding on the defendant's house in mid-July 2008. On cross-examination, he stated that before he put on that siding, the defendant had a red house trimmed in white.

Fred William Buis, II, testified that the defendant is his father. He lives in Tazwell, Tennessee, and receives mail at 469 Highway 25E South. He agreed that the residence pictured in Exhibit 10 was his house, which was built by July 4, 2008, and had "terra clay" colored siding. He stated that there would have been vehicles at his residence on September 25, 2008. He said that 595 Highway 25E South, the address listed in the search warrant, was the address of his childhood home that had been owned by his father. The old driveway leading downhill from the point .3 miles from the start of the new construction led to that house. He stated that the guardrail that was pictured in some of the exhibits had been put up within three weeks of the January 27, 2009 hearing.

### III. FINDINGS OF FACT

The Court makes the following factual findings based upon the evidence presented at the suppression hearing and the Court's own review of the photographs introduced by the parties:

Detective Bayless began investigating the defendant with the help of a confidential informant in September 2008. The informant, who had provided reliable information to Bayless and other officers in other cases, conducted two controlled purchases of oxycontin tablets from the defendant at his home on September 24 and 25, 2008. Prior to these transactions, the informant and the informant's vehicle were searched for money and contraband. The informant wore a recording device during the transactions. Detective Bayless conducted surveillence from a hill adjacent to the defendant's residence during the controlled purchases. From this vantage point, he saw the informant turn onto the defendant's driveway. With binoculars, he could see a portion of a beige building during the controlled purchases, but he thought this was an outbuilding because he had been to the defendant's home on two prior occasions and it had been red with white trim. Upon listening to the recording of the transactions after the controlled purchases, Bayless was able to identify the defendant's voice on the tape.

On the evening of September 25, 2008, Detective Bayless sought a search warrant for the defendant's residence. When writing the directions to the residence for the search warrant, Bayless relied upon his own memory of traveling to the home. In the search warrant, Bayless also gave longitude and lattitude coordinates obtained with a GPS from a point at the end of the defendant's driveway. He obtained the address included in the search warrant from the 9-1-1 and drivers' license databases. Bayless did not ask the judge issuing the search warrant for special permission to search at night. Bayless and at least two other officers executing the search warrant had been to the defendant's home before. While executing the search warrant, the officers found oxycontin and guns in the defendant's residence.

The defendant lives in a rural area with the next closest house being around one-

quarter mile from the defendant's house. To the right of the spot .3 miles on the newly constructed portion of Highway 25E is a rocky, cleared area that could have been a driveway at one point, but now appears to lead down to and end at old Highway 25E. About 100 yards from the point .3 miles from the start of new 25E is the point that corresponds to the GPS coordinates in the search warrant. To the right of the spot marking the GPS coordinates is a dirt road that leads downhill and also appears to end at old 25E. Roughly across old 25E from that dirt road is the defendant's son's home, which is gray. To the left of the GPS point is a gravel driveway that leads uphill to the defendant's house. The defendant's house has at least one outbuilding. The defendant's house was formerly red with white trim, but he had beige siding installed in mid-July 2008.

## IV. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The defendant contends that his rights under the Fourth Amendment were violated by both the issuance and the execution of the instant search warrant. With regard to the issuance of the search warrant, he maintains that (1) the affidavit fails to provide probable cause because the confidential informant was not reliable, (2) the affidavit fails to show any nexus between the place to be searched and the criminal activity alleged , and (3) the warrant is not sufficiently particular due to inaccuracies in the directions to the place to be searched. He also faults the execution of the search warrant (1) because search occurred at night without good cause and (2) the executing officers

11

seized firearms which were outside of the scope of the warrant. The Court will address each of these arguments in turn.

## A. Probable Cause

The defendant argues that the affidavit in the present case fails to provide probable cause to support the issuance of a search warrant because the confidential informant was not reliable. Specifically, he argues that the audio recordings of the alleged controlled purchase and the debriefing that followed show that the informant was untruthful to law enforcement in the debriefing. Thus, he maintains that the informant was not reliable and, thus, the information provided by the informant cannot generate probable cause for the warrant to issue. The government responds that the affidavit provides sufficient probable cause because it reflects that (1) Bayless had worked with the confidential informant for one month, (2) the confidential informant had previously provided information leading to other prosecutions and successful convictions, and (3) Bayless corroborated the information the informant provided about the defendant by visually monitoring the two controlled purchases and listening to the recordings from the purchases. Thus, it maintains that a reasonable police officer in Bayless's position would determine that probable cause existed to search the residence.

Initially, the Court notes that the defendant asks the Court to look beyond the search warrant affidavit to the evidence presented at the suppression hearing to determine the reliability of the informant. At the hearing, defense counsel presented a CD (Exhibit 3, marked for identification only) purportedly containing the recorded conversations of the informant on September 24, 2008. At the January 27 hearing, defense counsel argued that when debriefed on the CD, the informant told the officer that when he walked into the defendant's residence, the informant asked the defendant

whether he had any "greens," to which the defendant replied, "Yeah." Defense counsel contended that on the recording of the alleged transaction itself, the informant could not be heard to ask for "greens." The government argued that the Court could not consider the CD in determining the reliability of the confidential informant because it was restricted to an examination of the contents of the affidavit to determine the presence of probable cause. It also asserted that the defendant had failed to make the substantial showing that the affiant intentionally gave false information in the affidavit as required by Franks v. Delaware, 438 U.S. 154, 155, 164 (1978). At the hearing, the Court declined to accept the CD into evidence at that time. Instead, the Court marked the CD as Exhibit 3 for identification purposes only and stated that it would later determine whether it could listen to the CD.

Generally, in determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)) (alterations in original). In other words, the Court does not look beyond the four corners of the affidavit in assessing whether it provides probable cause.

In Franks v. Delaware, 438 U.S. 154, 155, 164 (1978), the Supreme Court examined whether a defendant ever has the right, pursuant to the Fourth and Fourteenth Amendments, to contest the truthfulness of sworn statements of fact in a search warrant affidavit. Sworn affidavits in support of search warrants are, in the first instance, presumed to be valid. Id. at 171.

13

Nevertheless, a defendant may attack the veracity of factual statements in the affidavit under certain limited circumstances:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56; see also United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).  If the defendant makes this showing and is granted what has come to be known as a "Franks hearing," he or she must show by a preponderance of the evidence that the affiant intentionally or recklessly included false statements, which are necessary to the probable cause finding, in the affidavit.  Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934.  If the defendant successfully makes this showing, the evidence gained as a result of the search must be suppressed.  Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934.

In the present case, the Court finds that the defendant has failed to show that he is entitled to a Franks hearing.  To prove the need for a Franks hearing, the defendant "must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth" and "must accompany his allegations with an offer of proof," including the provision of supporting affidavits.  Id.  The Supreme Court has described the showing as follows:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically

14

> the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. *The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.*

Franks, 438 U.S. at 171-72 (emphasis added). Here, the defendant seeks to impeach the statements of the informant with the CD, not those of Detective Bayless, the affiant. Even if the defendant were seeking to show that Bayless's statements in the affidavit that he listened to the recordings and that they corroborated everything the informant told him in the debriefing were false, the defendant's assertion that the informant's alleged use of the term "greens" for the oxycontin could not be confirmed in the recorded transaction does not prove a "deliberate falsehood or of reckless disregard for the truth" on the part of the affiant. Accordingly, the defendant has not proven that he is entitled to a Franks hearing, and the Court will not look beyond the four corners of the affidavit in evaluating the issuing judge's probable cause determination.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any

15

> showing that such a belief be correct or more likely
> true than false. A "practical, nontechnical"
> probability that incriminating evidence is involved is
> all that is required. Brinegar v. United States, 338
> U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879
> (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." Bennett, 905 F.2d at 934. Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id.

In the present case, the relevant portions of the affidavit state as follows:

> 3. During the course of this investigation, your affiant has utilized one confidential source, hereinafter referred to as "CS", whose veracity and reliability has been tested and verified through the use of a [sic.] consensual tape recordings made during contacts with the main subject of this investigation, who is Fred W. Buis. The CS has also provided information in the past to me and two other Law Enforcement Officers that has let to several other successful prosecutions and convictions.

> 4. In approximately September, 2008, I initiated an investigation through the Claiborne County Sheriff's Office of the Oxycontin trafficking activity of Fred W. Buis at his residence, 595 Hwy 25E South, Tazewell, Tennessee. I made arrangements with the CS for him/her to purchase Oxycontin tablets from Fred W. Buis at his residence on two occasions. During these occasions, which occurred within the past 48 hours, the CS purchased Oxycontin tablets from Fred W. Buis.

> 5. Specifically, I met with the CS at a safe location in

16

Claiborne County, Tennessee. I provided the CS with confidential funds with instructions to purchase Oxycontin tablet from Fred W. Buis at his residence. I searched him/her, and his/her vehicle was searched by me as well. Neither search resulted in finding any contraband or money. Thereafter, I provided the CS with a recording device to take with him/her to the residence. The CS related to me that he/she entered the residence and met with Fred W. Buis and purchased one Oxycontin tablet. Immediately upon leaving the residence the CS drove to a pre-determined location where the CS gave one Oxycontin tablet to me. In addition, the CS and his/her vehicle were searched, and no contraband or money was found as a result of the searches. The CS advised law enforcement that he/she obtained the Oxycontin tablet from Fred W. Buis. Since this transaction I have listened to the recording that the CS made and all the information on the recording is the same as relayed to me by the CS.

6. On the second occasion, I met with the CS at a safe location in Claiborne County, Tennessee. I provided the CS with confidential funds with instructions to purchase Oxycontin tablets from Fred W. Buis at his residence. I searched him/her, and his/her vehicle was searched by me as well. Neither search resulted in finding any contraband or money. Thereafter, I provided the CS with a recording device to take with him/her to the residence. The CS related to me that he/she entered the residence and met with Fred W. Buis and purchased Oxycontin tablets. Immediately upon leaving the residence the CS drove to a pre-determined location where the CS gave the oxycontin tablets to me. In addition, the CS and his/her vehicle were searched, and no contraband or money was found as a result of the searches. The CS advised law enforcement that he/she obtained the Oxycontin tablets from Fred W. Buis. Since this transaction I have listened to the recording that CS made and all the information on the recording is the same as relayed to me by the CS. Affiant is familiar with what Fred W. Buis' voice sounds like and I have identified said voice on the aforementioned recordings as to [sic.] belonging to Mr. Buis.

The Court finds that the affidavit on its face shows that the confidential informant is reliable. An informant's veracity, reliability, and basis of knowledge are all relevant to the totality of the circumstances test but are not rigid categories. Allen, 211 F.2d at 972-73. In the present case, the affidavit states that the confidential informant had proven reliable in the past by providing information that led to several successful prosecutions and convictions. In cases involving a confidential informant, such as this one, more is required than a simple attestation to the reliability of the informant. United States v. Ferguson, 252 Fed. App'x. 714, 721 (6th Cir. 2007). Instead, the law requires

> that an affidavit demonstrate more than simply blind faith in the words of an affiant who claims his unnamed informant is reliable. For example, in Rodriguez-Suazo, even though the officer's confidential informant had provided prior tips that resulted in over three arrests and convictions, the police still conducted some (albeit minimal) corroboration of the tip in question. 346 F.3d at 646-47. Similarly, in United States v. May, 399 F.3d 817 (6th Cir. 2005), we held that the tip of an unnamed confidential informant can support a finding of probable cause when "the issuing judge had before him 'additional evidence [that] buttressed the informant's information.'" 399 F.3d at 824 (quoting United States v. Williams, 224 F.3d 530, 532 (6th Cir. 2000)). One piece of additional evidence that the May court considered was that the informant had provided reliable information in the past, but we also considered the independent corroboration by the police. See also United States v. Williams, 224 F.3d 530, 532-33 (6th Cir. 2000) (finding probable cause from an affidavit that relied on a confidential informant who had previously provided information leading to arrests and convictions, but where the affiant also mentioned his own personal knowledge regarding the sale of drugs at the location to be searched and the affiant separately informed the issuing judge about police surveillance of the

18

residence), cert. denied, 531 U.S. 1095, 121 S. Ct. 821, 148 L. Ed. 2d 704 (2001).

Id.

In the instant case, the affiant gives two bases for the informant's reliability: (1) The affiant's attestation that the informant has proven reliable in the past and (2) the assertion that the affiant has "tested and verified" the informant's reliability through the use of an audio recording of the transactions with the defendant. The independent police corroboration needed in the face of a weak showing as to the veracity of the confidential informant may be established by a police-monitored controlled purchase. United States v. Coffee, 434 F.3d 887, 894 (6th Cir. 2006) (holding that the officer's "statements that he set up the controlled buy and took necessary precautions before and after the orchestrated purchase adequately corroborated the CI's information, and thus, provided sufficient probable cause for the issuance of the search warrant"). In this respect, the Court of Appeals for the Sixth Circuit has found sufficient police corroboration of an informant's reliability when officers conducted two controlled purchases even though the informant did not wear a wire during the purchases, United States v. Hawkins, No. 07-3634, 2008 WL 2178104, at *5 (6th Cir. May 23, 2008), and when officers conducted only one controlled purchase, which they monitored via a listening device, United States v. Jackson, 470 F.3d 299, 307 (6th Cir. 2006). See also United States v. Henry, No. 07-5867, 2008 WL 4691789, at *3 (6th Cir. Oct. 24, 2008) (holding single controlled purchase sufficient to corroborate informant's reliability). In the instant case, the affiant set up two controlled purchases, which were recorded simultaneously and then subsequently reviewed by the affiant, who was familiar with the defendant's voice. The Court finds that the two controlled purchases adequately corroborate the informant's reliability. Accordingly, the affidavit provided sufficient probable cause for the issuance of the search warrant.

19

## B. Nexus

The defendant asserts that the affidavit fails to provide a nexus between the criminal activity alleged and the place to be searched, i.e., the defendant's residence. An affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." United States v. Hawkins, 278 Fed. App'x. 629, 634 (6th Cir. 2008). In the present case, the affidavit reflects that the confidential informant purchased oxycontin from the defendant at his house on two occasions, the second being the same day as the search warrant issued. A recent controlled purchase from the location to be searched provides a nexus between that location and drug trafficking. United States v. Harris, 255 F.3d 288, 293-94 (6th Cir.), cert. denied, Taylor v. U.S., 534 U.S. 966 (2001). Accordingly, the Court finds that the affidavit provides a nexus between the alleged criminal activity and the place to be searched.

## C. Particularity

The defendant argues that the evidence seized pursuant to the search warrant should be suppressed because the description of the place to be searched was not sufficiently particular to permit the executing officers to search the correct residence with reasonable effort. In this regard, he asserts that the search warrant gave an incorrect address to, directions for, and description of his residence. Additionally, he maintains that there was a house across old Highway 25E from the defendant's residence that could have been mistakenly searched.

The Fourth Amendment requires that search warrants describe the place to be searched with particularity. U.S. Const. amend. IV. A warrant satisfies this requirement "if the

20

description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503 (1925). The particularity requirement does not turn upon the description in the warrant being "'technically accurate in every detail.'" United States v. Pelayo-Landero, 285 F.3d 491, 496 (6th Cir. 2001) (quoting United States v. Prout, 526 F.2d 380, 387-88 (5th Cir. 1976)). Instead, the test for determining whether a warrant is sufficiently particular contains two prongs: "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." United States v. Gahagan, 865 F.2d 1490, 1497 (6th Cir.), cert. denied, 492 U.S. 918 (1989).

The present search warrant gives the following description of the property to be searched:

> upon the following described premises in Claiborne County, Tennessee: the residence of Fred W. Buis located at 595 Hwy 25E South, Tazewell, Tennessee 37879 and all out buildings, vehicles, and persons located thereon. Direction [sic.] are as follows, starting at the intersection of Hwy 25E and Hwy 25E South travel southbound on Hwy 25E South for approximately 1 mile then turn left onto the new construction area of Hwy 25E South continue traveling south on the gravel roadway for approximately .3 miles to a gravel driveway on the right side of the road located at Latitude and Longitude N 36.43864 W 083.56545 drive to the end of the driveway to the residence of Fred W. Buis 595 Hwy 25E South Tazewell, Tennessee. To Wit: A single family dwelling with red wood siding, with a shingled roof and various vehicles around the residence.

Detective Bayless testified at the suppression hearing that he obtained the address for the residence

from the 9-1-1 and driver's license databases. He stated that he composed the directions to the defendant's house from memory, after having been to the defendant's house on two prior occasions, one of which occurred in the year preceding the search warrant. He said that the defendant's house had red siding and white trim when he went there before. Bayless got the latitude and longitude coordinates for a point at the end of the defendant's driveway using a GPS. He also went to the vicinity of the defendant's house on September 24 and 25, 2008, when he monitored controlled purchases at the defendant's home from an adjacent hill. He said that the defendant lived in a country setting and that the next closest house was one-quarter mile away. Bayless stated that at least two other executing officers were familiar with the location of the defendant's home. On cross-examination, he admitted that both the direction to turn right off the new construction on Highway 25 E and the statement that the defendant's house had red siding were incorrect.

Initially, the Court notes that the evidence presented at the suppression hearing did not prove that the address given in the search warrant, 595 Highway 25E South, was incorrect. As noted above, Detective Bayless obtained this address from the 9-1-1 and driver's license databases. The defendant's son testified that this address was for his childhood home, which had been owned by the defendant and was located some fifteen to twenty feet below the new highway. The defendant argues that this house no longer exists and was destroyed when the new road was constructed. The Court finds that the defendant had lived at the residence that was the subject of the search in excess of one year prior to September 2008 because Detective Bayless testified that he had gone to that residence on a domestic call about a year before the search warrant issued. If the defendant's address changed when he moved from the residence, which the defendant's son characterized as his childhood home, to his current residence, he was required to notify the

Tennessee Department of Safety of that change to the address on his driver's license within ten days. Tenn. Code Ann. § 55-50-333. Accordingly, the Court finds that the defendant has failed to prove that the address given in the search warrant was not the defendant's address.

With regard to the erroneous direction of the final turn and color of the defendant's house, the Court observes that errors in the description in a warrant do not render the warrant invalid if other information meets the particularity requirement: "[C]ourts routinely uphold warrants like the one at issue where one part of the description might be inaccurate but the description has other accurate information to identify the place to be searched with particularity." Pelayo-Landero, 285 F.3d at 497 (6th Cir. 2002) (finding particularity requirement met despite defendant's contention that the warrant failed to state the correct physical address); see also United States v. Durk, 149 F.3d 464, 466 (6th Cir. 1998) (affirming warrant's validity despite transposed numbers in house number and incorrect direction of travel from reference street).

In the present case, despite the incorrect direction for the turn onto the gravel driveway, the warrant is correct in the streets to be traveled. It also correctly describes the property to be searched as having a shingled roof, outbuildings and vehicles on the property, and a gravel driveway. It incorrectly states that the house to be searched has red siding, but it gives GPS coordinates for a point at the end of the defendant's driveway. The Court finds that the provision of the GPS coordinates for the defendant's driveway would serve to eliminate any confusion about whether the defendant's house was the proper one to search. Although the defendant argues that the officer could turn right as well as left at the GPS point, the Court observes that the "roadway" to the right is simply a set of tire tracks through dirt, not gravel, leading downhill and abruptly ending at old Highway 25E, which runs parallel to the new construction, not at a residence. Accordingly, the

23

Court finds that there is no possibility that an executing officer would have turned right rather than left at the GPS point.

Moreover, the Court observes that the knowledge of an affiant who is an executing officer can supplement an incomplete or incorrect description in a search warrant: "when one of the executing officers is the affiant who describes the property to the judge, and the judge finds probable cause to search the property as described by the affiant, and the search is confined to the areas which the affiant described, then the search, in this case, is in compliance with the [F]ourth [A]mendment." Gahagan, 865 F.2d at 1499. In Gahagan, a large rural piece of property contained four dwellings accessed at different times by two or three driveways. Id. at 1493. The search warrant listed the property to be searched as 7609 Douglas Lake Road. The affidavit stated that the officers desired to search both a house and a cabin on the property. At the evidentiary hearing, it was established that the cabin had a separate address, 7577 Douglas Lake Road. The mailbox at the end of the driveway to the house received mail for both the house and the cabin. The defendants argued that the affidavit could not cure any deficits in the warrant because it was neither attached nor incorporated by the warrant. Id. The court upheld the warrant, reasoning that the executing officer had supplied the description in the affidavit that included the cabin and, thus, knew the search was for both the house and the cabin. Id. at 1499. Furthermore, it determined that there was no possibility that the officers would search another residence by mistake as they had participated in a lengthy investigation of the drug transactions occurring on the property. Id.

In the present case, Detective Bayless supplied the directions and description for the defendant's house in the search warrant. He knew the actual location of the defendant's house because he had been there twice in the past and had conducted surveillance from the adjacent hill

24

on the day before and the day of the issuance of the search warrant.  See United States v. Case, No. 2:07-CR-111, 2008 WL 4865967, at *4 (E.D. Tenn. Nov. 10, 2008) (declining to conclude that warrant violated the particularity requirement despite lack of a street address when the executing officer had conducted surveillance at the residence to be searched).  The fact that the defendant's investigator could not be sure which property to search after following the directions in the warrant is irrelevant given Bayless's familiarity with the location of the defendant's house.

Finally, the defendant relies upon Knott v. Sullivan, 418 F.3d 561 (6th Cir. 2005), to argue that the warrant was invalid due to the plausibility of another residence that could have been mistakenly searched.  In Knott, the search warrant inaccurately described the car to be searched in "virtually every descriptor of the vehicle" contained in the warrant save the fact that the car was located at the police impound lot.  Id. at 568-69.  The errors in the warrant were "so extensive that there was a reasonable probability that the wrong vehicle could have been mistakenly searched." Id. at 569.  In combination with these errors, the court emphasized that the description given in the warrant described another vehicle owned by one of the defendant's family members.  Id. at 569.  The court held that given the extensive errors in the car's description along with the fact that a family member owned the car meeting the description in the warrant, there existed "more than a reasonable probability that the incorrect vehicle could have been searched, notwithstanding the fact that the affiant was involved in executing the search and the warrant noted that the vehicle was stored in the Athens County Sheriff's garage."  Id. at 570-71.

The Court finds the present case to be distinct from that in Knott in both the circumstances that motivated the court's decision.  Here, the errors in the search warrant were not extensive.  Moreover, the Court finds that no other residence could have been mistakenly searched

because no other driveway led from the GPS point given in the search warrant to a residence. Accordingly, the Court finds that the description of the residence in the search warrant was sufficiently particular to satisfy the Fourth Amendment, especially in light of Detective Bayless's participation in the warrant's execution.

### D. Search at Night

The defendant argues that neither the search warrant nor the affidavit provide good cause for the officers to conduct the search of his home at night. The government argues that the requirements of Federal Rule of Criminal Procedure 41 do not apply to state search warrants.

Rule 41 requires that the warrant direct the officer that it be executed during the daytime, which is defined as "the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed. R. Crim. P. 41(a)(2)(B), (e)(2)(B). Here, the warrant directs the executing officer "to make immediate search of the premises[.]" The warrant for the search of the defendant's residence issued at 11:40 p.m.; thus, an immediate search necessarily would have occurred at night. The inventory of items seized relates that the search began at 12:50 a.m. and that the last item taken, $650 in United States currency, was seized at 4:07 a.m. The defendant is correct that the search warrant contains no statement of good cause for the search to occur at night. Nevertheless, "by its terms Rule 41 does not apply in a case where no federal officers are involved." United States v. Shields, 978 F.2d 943, 946 (6th Cir.1992); United States v. Bennett, 170 F.3d 632, 635 (6th Cir. 1999). In the present case, the record is devoid of evidence that any federal officer was involved in the execution of the search warrant at the defendant's house. Accordingly, no statement of good cause for a search at night was required.

### E. Scope of Warrant

The defendant argues that the officers executing the search warrant improperly seized firearms, which were not within the scope of the search warrant. He asserts that the guns were not evidence or contraband, as he is not a convicted felon. The government maintains that the firearms were lawfully seized under the plain view doctrine. It asserts that drug dealers are known to carry firearms and that this fact renders the guns in the defendant's home contraband, which can be seized if in plain view.

In the present case, neither the search warrant nor the affidavit, which is referenced in the warrant, specify firearms as evidence for which the officers could search. "The plain view doctrine or exception to the Fourth Amendment's warrant requirement permits officers executing a search warrant to seize objects outside the scope of the warrant provided three criteria are met: the initial intrusion by the officers must be lawful; the discovery of the incriminating evidence must be inadvertent; and the incriminating nature of the evidence must be 'immediately apparent.'" United States v. Beal, 810 F.2d 574 , 576 (6th Cir. 1987) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)). In the present case, the executing officers were present in the defendant's house pursuant to a valid search warrant and the discovery of the guns was inadvertent. Thus, the controversy turns upon whether the incriminating nature of the firearms was "immediately apparent." Detective Bayless testified that during the search of the defendant's living room/kitchen area, officers found 128 oxycontin pills and fifteen guns, including a short-barreled rifle located under the table. Bayless stated that the barrel of the rifle was cut to one or one and one-half feet in length, which Bayless said was obviously an illegal length. Eight more guns were found in the defendant's bedroom, which is also where the officers found currency, including bills bearing

the serial numbers of the money used by the confidential informant to purchase oxycontin from the defendant. Finally, Bayless stated that three guns were found in a Pontiac GTO in the basement garage area of the house. A disassembled AK-47 in a box was also found in this area. Bayless testified that the confidential informant had given him information that the defendant traded drugs for guns. He said that he knew from his experience as a law enforcement officer that drug dealers often have guns. Bayless said part of the reason he applied for the search warrant at night, was that the team leader Lieutenant Hurley believed that going at night would be safer because the defendant had weapons in the house.

Based upon this testimony, the Court finds that the officers could properly seize the guns under the plain view doctrine. Upon seeing the short-barreled rifle, it was immediately apparent to Detective Bayless that it was contraband. With regard to the other guns, the Court finds that their nature as incriminating evidence was also immediately apparent because the confidential informant had informed Bayless that the defendant took guns in trade for drugs. Because the guns in the house were potentially proceeds from the defendant's drug transactions, they were incriminating evidence in this case.

Finally, the Court finds that the incriminating nature of the guns in the defendant's home was also immediately apparent due to the well-established relationship between guns and the drug trade. The Court of Appeals for the Sixth Circuit has recognized this relationship: "'[D]ealers in narcotics are well known to be dangerous criminals usually carrying firearms.'" United States v. Moreno, 658 F.2d 1120, 1123 (6th Cir. 1981) (recognizing firearms as tools of the drug trade) (quoting United States v. Korman, 614 F.2d 541, 546 (6th Cir.), cert. denied, 446 U.S. 952 (1980)); United States v. Case, No. 2:07-CR-111, 2008 WL 4865967, at *9 (E.D. Tenn. Nov. 10, 2008). In

the present case, Detective Bayless testified that he knew that guns were a part of the drug trade based on his law enforcement experience. Accordingly, the Court finds that the guns were properly seized pursuant to the plain view exception to the warrant requirement.

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence resulting from the search of the defendant's residence. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [**Doc. 10**] be **DENIED**.[3]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

29